GENERAL ATOMIC COMPANY, Plaintiff-Appellant, *v.* COMMONWEALTH EDISON COMPANY, Defendant-Appellee.

Third District   No. 75-320

Opinion filed April 26, 1976.

Berry & O'Conor, of Ottawa, and Price, Cushman, Keck, Mahin & Cate, of Chicago (James T. Otis, of counsel), for appellant.

Isham, Lincoln & Beale, of Chicago, and Johnson, Martin & Russell, of Princeton (Richard E. Powell, of counsel), for appellee.

Mr. JUSTICE STOUDER delivered the opinion of the court:

This action was brought by plaintiff, General Atomic Company ("General"), by its partners Gulf Oil Corporation and Scallop Nuclear,

Inc., for a declaration that a nuclear fuel contract was terminated by General pursuant to a power created by the contract, and as a result of commercial impracticability within the meaning of the Uniform Commercial Code. General sought a declaration that no agreement to arbitrate exists, and accordingly sought a stay of arbitration proceedings previously initiated by defendant, Commonwealth Edison Company ("Edison"). General contended that in any event, disputes concerning the termination of the contract were not within the scope of the arbitration clause.

The trial court granted the motion of defendant Edison to dismiss the complaint and to compel arbitration and denied the motion of General for a temporary stay of arbitration pending trial. No evidence was taken, and all issues arise from the pleadings.

Plaintiff General is a partnership composed of Gulf Oil Corporation and Scallop Nuclear, Inc. General manufactures and markets an advanced nuclear reactor for use in the generation of electricity known as the high temperature gas-cooled reactor.

Edison is an Illinois public utility engaged primarily in the business of generating, distributing and selling electricity in northern Illinois.

General succeeded to certain nuclear fuel fabrication and supply business formerly conducted by Gulf United Nuclear Fuels Corporation (GUNF) which had merged with Gulf Oil Corporation on November 30, 1973. The nuclear fuel business was operated as a division of Gulf Oil Corporation until the assets and liabilities of this division were transferred to General effective January 1, 1974. Among the transferred assets and liabilities was a Reload Fuel Contract dated May 25, 1971, between United Nuclear Corporation (UNC) and Commonwealth Edison Company, which had been assigned by UNC to Gulf United Nuclear Fuels Corporation with the consent of Edison as of July 1, 1971.

The Reload Fuel Contract concerned nuclear fuel for Units 1 and 2 of a new nuclear power plant being constructed by Edison near Seneca in Brookfield Township, La Salle County, Illinois. Each unit was originally scheduled for refueling approximately once a year at which time spent fuel would have been removed and fresh fuel inserted.

At the time the Reload Fuel Contract was made, the Atomic Energy Commission (AEC) had taken the position, in regulations issued in December, 1970, that its consideration of environmental impact in licensing nuclear power stations such as Edison's La Salle units was limited. However, on July 23, 1971, two months after the Reload Fuel Contract was signed, the United States Court of Appeals for the District of Columbia held in *Calvert Cliffs' Coordinating Committee, Inc. v. Atomic Energy Commission*, 449 F.2d 1109 (D.C.Cir. 1971), that the full scope of environmental review contemplated by the National

Environmental Policy Act of 1969 must be implemented by the AEC in its licensing process.

This decision required the AEC to examine environmental issues in much greater detail in connection with nuclear power plant licensing proceedings, and significantly delayed action by the AEC in virtually all such proceedings, including then pending applications such as those for Edison's La Salle Units 1 and 2. The public, which theretofore had rarely participated in nuclear power plant licensing proceedings, was thus encouraged to participate, and public demands grew for extensive proof of safeguards for the environment in nuclear power plant design and construction. Thus, the time required to conclude all public hearings, including those affecting Units 1 and 2, was substantially increased.

Subsequent to the making of the Reload Fuel Contract, new concerns were raised about the safeguarding of plutonium and other special nuclear materials, not only to protect humans from dangerous exposure, but also to prevent the theft of plutonium for illicit use. As a result, the AEC proposed various new safeguard regulations governing the control, packaging and physical protection of plutonium.

Both the licensing delays attributable to *Calvert Cliffs'* and the new proposed AEC regulations concerning plutonium had the effect of increasing costs and delaying the construction schedule.

Under the contract either party could terminate upon the occurrence of *force majeure* circumstances affecting the ability of the other to perform. The relevant provision of Section 13 of the Reload Fuel Contract stated as follows:

"* * * Purchaser (Edison) shall (not) be liable for delay in performance hereunder if purchaser is rendered unable to accept delivery of fuel hereunder or use such fuel by causes beyond its reasonable control including, but not limited to: fire, work stoppage, acts of civil or military authority, including delays or failures to act by any government authority, federal, state or local, insurrection or riot, embargoes, car shortages, wrecks or other delays in transportation, or inability to obtain necessary labor or manufacturing facilities due to such causes. In the event that an excusable delay occurs with respect to Unit 1 or Unit 2 or both, and it is reasonably foreseeable that such excusable delay will delay Purchaser's ability to use the fuel or UNC's (General's) ability to deliver it by more than 30 months, the party not suffering the *force majeure* may terminate and neither party shall have further obligation to the other with respect to fuel not yet delivered."

Accordingly, on July 22, 1974, General sent a letter to Edison whereby it asserted that it was terminating the contract pursuant to the terms of the *force majeure* clause.

On August 6, 1974, Edison responded to General's letter, denying that General had succeeded to the rights of GUNF under the contract, and denying that the provisions of the contract relied upon were applicable. Edison also stated that even if such provisions were applicable, any right to so terminate had been waived. When General refused to recede from its position that it had the right to terminate the contract and had allegedly done so, Edison demanded arbitration of the question pursuant to the contract's arbitration clause. That clause provides in relevant part:

"Any dispute arising from this Contract, including any failure to agree upon any matter where this Contract provides for future agreement of the parties, shall be submitted to arbitration upon request of either party."

Numerous matters were expressly left for future agreement by the parties. For example, if Edison wished to insert experimental fuel, or fuel not provided by General, at any time over the period covered by the Reload Fuel Contract, and Edison and General agreed that this insertion would adversely affect the fuel which had been provided by General, the parties would then agree on an adjustment of the warranty.

On November 13, 1974, General, by its partners, filed this action for a declaratory judgment and stay of arbitration in the circuit court of La Salle County, asking the court to declare that there was no agreement to arbitrate the dispute between the parties and to stay arbitration. General also asked the court to declare that performance of the Reload Fuel Contract was excused due to commercial impracticability within the meaning of the Uniform Commercial Code.

Edison appeared and obtained extensions of time to plead up to and including January 15, 1975. On that date Edison simultaneously filed a motion to dismiss and to compel arbitration in this action, and also filed a separate petition to compel arbitration under the Federal Arbitration Act and stay these proceedings, in the United States District Court at Chicago.

On June 13, 1975, a hearing was held by the circuit court on the motions pending before it. At the conclusion of that hearing, the court stated that, upon presentation by Edison's counsel, it would sign an order dismissing the complaint and directing the parties to proceed to arbitration. Such an order was entered on June 13, 1975, and this appeal was taken.

Thereafter, on September 30, 1975, the United States District Court granted Edison's motion to compel arbitration pursuant to the Federal act but declined to stay this action. (*Commonwealth Edison Co. v. Gulf Oil Corp.*, 400 F. Supp. 888 (N.D. Ill. 1975).) The record discloses that on October 28, 1975, General filed an appeal from this order, presently pending before the United States Court of Appeals for the Seventh Circuit.

Numerous matters have been briefed by the parties concerning the existence and scope of the arbitration agreement. The plaintiff contends that no agreement to arbitrate exists because the contract between the parties, which contained an arbitration clause, was terminated pursuant to a power created by that agreement and as a result of commercial impracticability within the meaning of the Code. The plaintiff contends further that in any event, disputes concerning such termination were not within the scope of the arbitration clause.

Plaintiff seeks to avoid the effect of an arbitration clause, which on its face applies to any dispute arising from the contract, by invoking another clause in the same contract, permitting termination in certain specified instances. Plaintiff's reliance on a provision in a contract, which in other respects it seeks to avoid, betrays its assertion that the dispute did not arise from the contract. Whether the plaintiff properly exercised the *force majeure* clause constitutes a dispute arising from the contract and is therefore an arbitrable question.

In substance, plaintiff argues that the exercise of a power to terminate an agreement puts an end to the agreement, and any arbitration clause contained therein, so that arbitration relating to such termination is foreclosed. Were this contention tenable, one could persuasively argue that performance by the parties discharges their obligations and terminates the agreement, thereby precluding arbitration of any dispute relating to such performance. Plaintiff concedes in its brief, however, that the arbitration clause in the instant appeal applies to any dispute arising from "the performance or breach of the parties' routine obligations during the life of the Reload Fuel Contract." Plaintiff's concession thus undermines the foundation for its own argument.

Arguments have been made as to the existence of the contract. Without expressing any view on this matter, we believe that whether or not the contract continued to exist after the plaintiff exercised the power to terminate, nevertheless, arbitration may be compelled if the dispute concerning termination is within the scope of the arbitration clause. (*Flood v. Country Mutual Insurance Co.*, 41 Ill. 2d 91, 242 N.E.2d 149; *Harrison F. Blades, Inc. v. Jarman Memorial Hospital Building Fund, Inc.*, 109 Ill. App. 2d 224, 248 N.E.2d 289.) We believe that the dispute in the instant appeal was within the scope of the arbitration clause, and the matter was therefore arbitrable. For the foregoing reasons the judgment of the circuit court of La Salle County is affirmed.

Judgment affirmed.

ALLOY, P. J., and STENGEL, J., concur.